## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| **GREGORY DALZELL, JR.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 1:22-cv-407** |
| ) | |
| **ARLINGTON COUNTY** ) | |
| **SHERIFF'S OFFICE,** ) | |
| ) | |
| **and** ) | |
| ) | |
| **BETH ARTHUR, SHERIFF,** ) | |
| **in her individual and official capacity,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## COMPLAINT

Plaintiff, Gregory Dalzell, Jr. ("Plaintiff" or "Dalzell"), by counsel, hereby alleges the following causes of action:

## INTRODUCTION

1.    Plaintiff brings a cause of action pursuant to 42 U.S.C. § 1983 against the Arlington County Sheriff's Office and Beth Arthur, in her individual and official capacity, for a violation of Plaintiff's liberty interests in his reputation and his ability to obtain future employment under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

2.    In addition, Plaintiff brings a cause of action for defamation *per se* against Beth Arthur, in her individual capacity, arising from false and defamatory statements of fact about Plaintiff in a termination letter dated April 22, 2020.

**PARTIES**

3.     Plaintiff, Gregory Dalzell, Jr., is a natural person and a citizen of the Commonwealth of Virginia, residing in Fairfax County, Virginia.

4.     Defendant, Arlington County Sheriff's Office (the "Sheriff's Office"), is established pursuant to § 15.2-1609 *et seq.* of the Code of Virginia and, by and through the sheriff, exercises all the powers conferred and performs all the duties imposed upon sheriffs by general law. The Sheriff's Office serves more than 220,000 residents with 270 employees, including sworn deputy sheriffs and civilian staff.

5.     Defendant, Beth Arthur ("Arthur"), is a natural person and a citizen of the Commonwealth of Virginia, residing in Arlington County, Virginia. Arthur is the Sheriff of Arlington County, Virginia, an independent elected office holder of the Commonwealth of Virginia created pursuant to § 15.2-1609 of the Code of Virginia.

**JURISDICTION AND VENUE**

6.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because Count I arises under 42 U.S.C. § 1983, a law of the United States.

7.     On April 22, 2021, Plaintiff filed a complaint for defamation against defendant Beth Arthur, in her individual capacity, in the Circuit Court of Cumberland County, Virginia, No. CL21-107-00, arising from the same facts as detailed herein.

8.      On March 29, 2022, the Circuit Court of Cumberland County entered a Nonsuit Order of Plaintiff's complaint.

9.     This Court has supplemental jurisdiction over the subject matter of Plaintiff's state law claim for defamation under Count II pursuant to 28 U.S.C. § 1367(a) because this claim is related to and forms the same case or controversy as Plaintiff's claim under Count I.

10.     Venue for this action lies properly in the United States District Court for the Eastern District of Virginia, Alexandria Division, pursuant to 28 U.S.C. § 1391, because the events giving rise to Plaintiff's claims occurred in Arlington County, Virginia, which is a territory included within those assigned to the Alexandria Division of the Eastern District of Virginia.

**<u>FACTUAL BACKGROUND</u>**

11.     Plaintiff is and has been an upstanding citizen with an outstanding reputation in his community.

12.     Plaintiff is a former employee of the Sheriff's Office where he began as an 18-month probationary employee of the Sheriff's Office as a Deputy on or about June 3, 2019.

13.     From approximately July through December 2019, Plaintiff attended and successfully completed his training at the Northern Virginia Criminal Justice Training Academy.

14.     From January 2020 until February 16, 2020, Plaintiff performed various training rotations such as warrants, transportation, and court security.

15.     From on or about February 16, 2020, until the end of March 2020, Plaintiff was assigned to train in the Arlington County jail.

16.     During that time, Plaintiff was assigned Field Training Officers ("FTOs"). FTOs were to train, follow, and monitor Plaintiff's work assignments in the jail and to complete approximately two-page daily reports evaluating his work activity that both the FTO and Plaintiff were to sign.

17.     FTOs assigned to Plaintiff during February and March provided these two-page daily reports for approximately six days in February and approximately two days in March 2020, but for approximately eleven days in February and March, no FTOs provided, reviewed, or signed these daily reports with the Plaintiff.

18.     All completed FTO reports that were done indicated Plaintiff performed his job duties appropriately and satisfactorily.

19.     Each Sheriff trainee receives a training folder that contains references to the departmental policies that apply in the jail. FTOs are to sign off that they have reviewed the jail policies with the trainee. Moreover, at the conclusion of the training, a senior officer reviews the folder for completeness and signs off. Except for the FTOs from warrants, Plaintiff's FTOs in the jail neither reviewed the training folder's policies and procedures with Plaintiff nor signed off that they had reviewed the folder with Plaintiff, and no senior officer signed off on Plaintiff's training folder.

20.     The Sheriff's Office never provided Plaintiff with written, concrete notices, or guidance regarding the proper procedure for his work in the jail or for improving, or correcting if needed, Plaintiff's performance during any of those training days.

21.     FTOs did not teach Plaintiff jail policies and procedures including those governing surveillance tours, bathroom breaks, use of vest during bathroom breaks, activation of the TV area button, recording completed surveillance tours, and correcting recording errors in the Officer Activity Log ("OAL").

22.     There are three phases of employee training in the jail: (1) Constant Supervision, (2) Shadowing, and (3) Duty Tour. Each level indicates the amount of oversight a trainee receives from his FTOs.

23.     Plaintiff was designated as under the Constant Supervision phase from February 16, 2020, through on or about March 27, 2020. On or about March 28, 2020, Plaintiff began the Shadowing phase. The Shadowing phase is where an FTO comes in and out of the unit at unspecified, periodic times during a trainee's shift to observe and provide guidance to a trainee.

Plaintiff began his Duty Tour phase on or about April 1, 2020, and Plaintiff was no longer considered a trainee.

24.     During Plaintiff's jail assignment, he was to physically observe his assigned jail cells during a surveillance tour (also referred to as a round) approximately every half hour and report his completion of the tour by way of an OAL entry each time. A deputy could log the tour into the OAL at the start or at the completion of the tour and Plaintiff was told that most employees logged the surveillance tour at its start.

25.     During March, in response to a request for a volunteer to work in the jail's intake room due to its being short-handed, Plaintiff offered to help. The next day at roll call, Sergeant Bhagwandin publicly thanked Plaintiff for helping out and said that he had done a good job.

26.     Contrary to the Sheriff's training policies, Plaintiff's FTO, Corporal Terry, left Plaintiff alone in Unit 7A during his shift for 4.5 to 5 hours on March 27, 2020, before Plaintiff's Shadowing phase began. When FTO Corporal Terry did return to Unit 7A, he told Plaintiff he had erred in placing Plaintiff on Shadowing phase that Plaintiff was to be under the Constant Supervision phase. During this period, FTO Corporal Terry told Plaintiff, "from what I can tell, you are doing a f-ing great job, or words to that effect"

27.     On April 1, 2020, although Plaintiff had no "Successful Completion of Field Training Memo," Plaintiff's FTP, Corporal Terry, told Plaintiff he was "cut loose" to start his Duty Tour, during which he conducted his shift independently because he was no longer considered a trainee.

28.     On April 2, 2020, around 12:30 pm, Plaintiff and Sgt. Meyers, a training official, received an email from Sgt. Lyons informing them that Plaintiff was missing eleven (11) FTO daily evaluation sheets. Plaintiff's training evaluations had not been completed and/or received by

the training section for the dates of February16, March 1, 4, 5, 13, 18, 19, 23, 24, 27 and 28. Plaintiff was scheduled to begin his normal tour of duty on March 29, 2020, provided all forms were completed by his FTO and a "Successful Completion of Field Training Memo" was forwarded to the training section.

29.     On April 3, 2020, at around 3:00 am, Sergeant Meyers visited Plaintiff and reported that he had requested Corporal Terry's FTO evaluation forms for Plaintiff by email and showed Plaintiff the request. Sergeant Meyers said Corporal Terry claimed he had provided them, but Sergeant Meyers said that was not true. Sergeant Meyers also reported he would propose to senior leadership that Plaintiff could complete his training in a single shift and left Plaintiff with a fist bump, telling him not to worry.

30.     Plaintiff next reported to work on or about April 6, 2020. During the morning roll call, Plaintiff was not called and later advised by Captain Burgess that he was being placed on administrative leave pending an internal investigation.

31.     By telephone calls on or about April 8, 2020 and April 13, 2020, Captain Juan Gelabert ("Captain Gelabert"), on behalf of Internal Affairs for the Sheriff's Office, advised Plaintiff of an internal administrative investigation, but did not inform Plaintiff of any details.

32.     During the April 13, 2020 call, when Plaintiff asked Captain Gelabert if he was going to lose his job, Captain Gelabert said, "Greg, I wouldn't even trip on that right now. That's way down the line."

33.     On or about April 15, 2020, Plaintiff met with Captain Gelabert and Sergeant Lyons for approximately 30 minutes. During the meeting, Captain Gelabert provided Plaintiff with an April 13, 2020 *Notice of Internal Investigation—201A-007* where Plaintiff learned for the first time that there was an alleged issue with Plaintiff's surveillance tours in the jail. Captain Gelabert

also questioned Plaintiff regarding video footage of his shift on March 28, 2020, when Plaintiff was considered in the Shadowing Phase. Captain Gelabert claimed, in part, Plaintiff logged a surveillance tour when he allegedly did not conduct the tour.

34.     This statement by Captain Gelabert also constitutes the first time Plaintiff learned of an alleged recording issue with the OAL.

35.     Plaintiff does not recall FTO Corporal Terry periodically entering the Unit to observe Plaintiff on March 28, 2020, as obligated under the Sheriff Office's training procedures. Instead, Plaintiff recalls that, rather than monitor Plaintiff, FTO Corporal Terry would call Plaintiff on the telephone to see if he needed anything.

36.     On or about April 21, 2020, Plaintiff next met with Deputy Chief David Kidwell and Captain Gelabert. Deputy Chief Kidwell repeated the allegations Plaintiff had heard for the first time on April 15, 2020 from Captain Gelabert. Deputy Chief Kidwell also mentioned other allegations such as missed cells (some of which were empty). Deputy Chief Kidwell also informed, and Plaintiff learned, for the first time that any mistakes in the OAL can be corrected by a memorandum clarifying the OAL.

37.     Not until April 21, 2020 did Plaintiff learn that it was common practice–and even encouraged–to clarify events in the OAL by way of a supplemental memorandum. No one responsible for Plaintiff's training had advised him that there was an error in the OAL on March 28, 2020 or any other date he was working in the jail for that matter, much less that the master control log could be and is typically amended by writing a supplemental memorandum.

38.     Many of the cells which the Sheriff's Office claimed Plaintiff "bypassed" during surveillance tours were in fact empty. Other cells were clearly within Plaintiff's vision, as they were located immediately in front of or adjacent to the stairwell which he ascended on each of his

surveillance tours. In addition, if an inmate were standing in his/her cell, Plaintiff could see the inmate through the window without looking in directly from the front of the cell.

39.     Deputy Chief Kidwell advised Plaintiff that he would be terminated or could resign. Plaintiff asked if he could have a second chance. Deputy Chief Kidwell said no. Further, Deputy Chief Kidwell told Plaintiff that if he resigned, Deputy Chief Kidwell would not include information in Plaintiff's personnel file that Plaintiff had falsified records. Plaintiff, stunned and under great duress at this point, believed that he was trapped and could not leave the room until he signed the Letter of Resignation. Deputy Chief Kidwell forced Plaintiff to sign the Letter of Resignation.

40.     Later that day, Plaintiff withdrew his resignation by phone call to Captain Gelabert and confirmed the same by e-mail to Captain Gelabert.

41.     Then by letter dated April 22, 2020, Arthur terminated Plaintiff's employment with the Arlington County's Sheriff's Office effective April 23, 2020 and stating, in part:

> While still in your 18-month probationary period, you failed to follow several policies and procedures that were taught to you during your field training. You failed to conduct surveillance rounds and falsified official Office records on numerous occasions. As such, you did not meet the standards required during your probationary period.

Letter from Arthur to Plaintiff, Apr. 22, 2020, attached as Exhibit A.

42.     On information and belief, Arthur placed this false termination letter in Plaintiff's personnel file and further published this letter to numerous jail employees in the Sheriff's Office, including employees in the jail's Human Resources department, Plaintiff's chain of command and related investigators, and others in and outside the department who had no interest or duty to know of the contents of the letter. Further, every available training record showed that Plaintiff did, in fact, meet the standards required by the position.

43.     The foregoing April 22, 2020 statement by Arthur is false and defamatory as it states, infers, and implies that Plaintiff intentionally, with malice aforethought, failed to follow several alleged policies and procedures and, moreover, that he intentionally falsified official office records, rather than simply make record keeping errors, on numerous occasions when he had not been properly trained or monitored by the FTOs assigned to him in the jail during his training period.

44.     Arthur failed to follow her own department's Personnel Management policy (2-700) and related procedure (2-701, 2-702, 2-703, and 2-704). *See* Personnel Management Policy, attached as Exhibit B.

45.     Policy 2-700 states, in part: "It is the policy of this office to impose disciplinary action fairly, impartially, and only as necessary." *See* Ex. B.

46.     Policy 2-701, entitled "Responsibilities of Supervisors," states, in part: "Employee performance deficiencies should be brought to the employee's attention, as necessary, throughout the employee evaluation period.  The performance appraisal conference should not be the first time an employee is informed of the deficiencies in performance." *See* Ex. B.

47.     Policy 2-702, entitled "Disciplinary Action Guidelines," states, in part: "In all cases, supervisors have the responsibility to use discretion in determining discipline. In cases where employees continue to violate the same or similar policies, progressive action should occur (e.g., start with training, counseling and progress through the various steps of discipline as outlined in 2-703)." *See* Ex. B.

48.     Policy 2-703, entitled "Progressive Action," first calls for Counseling, then Written Reprimand, then Suspension, and provides that other disciplinary action may include, but are not

limited to, loss of leave, reduction in salary, extension of probation/anniversary, denial of pay increase, and involuntary demotion. Meanwhile, Policy 2-703 states,

    a.    For severe offenses or when other disciplinary actions have been exhausted, the Sheriff may dismiss the employee. . . .

    b.    Prior to being dismissed, the employee shall meet with the Sheriff and Chief Deputy to offer any additional information that may not have come up during the initial investigation. This is an opportunity for the employee to review the incident prior to the Sheriff making their decision on dismissal.

*See* Ex. B.

49.    Policy 2-704, entitled "Administrative Hearings," states, in part:

1.    When the circumstances, gravity, or frequency of violations indicate that dismissal is eminent or has already occurred, the employee **may request an administrative hearing**.

    a.    The hearing may be conducted by the Sheriff or designee, but will not be  conducted by any investigative office or official involved in the case surrounding the circumstances of the dismissal.

    b.    The hearing may be conducted pre- or post-termination and is designed to allow the employee the opportunity to present any additional facts, details or explanations surrounding the conduct.

2.    All administrative hearings are documented.

*See* Ex. B (emphasis in original).

50.    Plaintiff neither met with the Sheriff and Chief Deputy prior to his termination nor did he ever go through any further training or participate in any progressive disciplinary policy.

51.    Arthur intended her letter of April 22, 2020 to be harsher than was necessary to terminate Plaintiff, especially after allowing Plaintiff to withdraw his resignation and encouraging him to believe he would be allowed to explain and contest the investigation findings.

52.    Based on the allegations of Defendant's letter of April 22, 2020, Plaintiff was never taught how to correctly survey the said jail cells or that he could correct any entry errors entered

into the OAL should his errors be brought to his attention during his shifts or afterwards when reporting on said jail cells.

53.     On April 22, 2020, Plaintiff, by counsel, requested an administrative hearing for the Plaintiff, and counsel did so numerous times thereafter with Defendants' then counsel.

54.     Defendants denied each of Plaintiff's requests for an administrative hearing.

55.     The Sheriff's Office has a practice of releasing personnel files to inquiring employers in law enforcement, particularly in Northern Virginia and the District of Columbia.

56.     During Plaintiff's tenure with the Sheriff's Office, two law enforcement agencies encouraged Plaintiff to leave the Sheriff's Office and join their agencies following completion of Plaintiff's training with the Sheriff's Office. Plaintiff's termination by the Sheriff's Office made such employment impossible.

57.     Since the Plaintiff's termination he has been asked by a person he knows in local law enforcement about his termination by the Sheriff and Plaintiff was unable to fully respond.

58.     Plaintiff intends to apply for positions in law enforcement with employers in Northern Virginia, and possible other jurisdictions, when he completes his undergraduate degree, several of which require a security clearance.

59.     These prospective employers are likely to request Plaintiff's personnel file from the Sheriff's Office, or information relating to his employment and termination, including the Sheriff's letter of April 22, 2020 and the damaging information leading to his termination as part of a routine law enforcement employment background check.

60.     For example, Plaintiff has interest in a position with the federal government, such as with the United States Department of Justice. These positions often require a detailed security

clearance and require the release of personnel files or related information to obtain such a clearance.

## STATEMENT OF CLAIMS

### COUNT I:

**VIOLATION OF THE LIBERTY INTERESTS IN PLAINTIFF'S REPUTATION AND
HIS ABILITY TO OBTAIN FUTURE EMPLOYMENT
UNDER THE DUE PROCESS CLAUSE OF THE
FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION
(42 U.S.C. § 1983)
AGAINST BOTH DEFENDANTS**

61.     Plaintiff incorporates by reference and re-alleges each allegation set forth above.

62.     Plaintiff has liberty interests in his reputation and his ability to obtain future employment under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

63.     Post-termination process is required by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

64.     At all material times, Arthur was acting under the color of state law as the Sheriff of Arlington County, Virginia, an independent elected office holder of the Commonwealth of Virginia created pursuant to Virginia Code § 15.2-1609.

65.     By letter dated April 22, 2020, Arthur terminated Plaintiff's employment, stating, in part:

> While still in your 18-month probationary period, you failed to follow several policies and procedures that were taught to you during your field training. You failed to conduct surveillance rounds and falsified official Office records on numerous occasions. As such, you did not meet the standards required during your probationary period.

Ex. A.

12

66.     On information and belief, Arthur placed the letter in Plaintiff's personnel file and published this letter to numerous jail employees in the Sheriff's Office, employees in the jail's Human Resources department, Plaintiff's chain of command and related investigators, and others in and outside the department who had no interest or duty to know of the contents of the letter.

67.     The foregoing April 22, 2020 letter statement by Arthur is false and defamatory as it states, infers, and implies that Plaintiff intentionally and deliberately, with malice aforethought, failed to follow several alleged policies and procedures and, moreover, that he intentionally and deliberately falsified official office records on numerous occasions, rather than simply make an alleged and unintentional recording errors, when he had not been properly trained or monitored by the FTOs assigned to him in the jail.

68.     Defendants placed this letter of April 22, 2020, among other alleged supporting documentation, in Plaintiff's personnel file.

69.     This letter and related information damages Plaintiff's good name and places a stigma on Plaintiff's reputation.

70.     The letter and related information were made in conjunction with the termination of Plaintiff's employment with the Sheriff's Office.

71.     Defendants denied Plaintiff's repeated request for an administrative hearing per the Sheriff's own policies in an effort to clear his name.

72.     The Sheriff's Office has a practice of releasing personnel files to inquiring employers in local, state and federal law enforcement, particularly in Northern Virginia and the District of Columbia.

73.     Plaintiff intends to apply for positions in law enforcement in Northern Virginia, and possible other jurisdictions, when he completes his undergraduate degree, several of which require a security clearance.

74.     These prospective employers are likely to request Plaintiff's personnel file from the Sheriff's Office as part of a routine background check.

75.     As such, the false and stigmatizing information related to the Plaintiff's termination is likely to be inspected by prospective employers.

76.     By improperly denying Plaintiff an administrative name-clearing hearing, Defendants failed to provide Plaintiff post-termination process as required under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

77.     By improperly denying Plaintiff an administrative name-clearing hearing, Defendants arbitrarily, recklessly, willfully, and wantonly disregarded Plaintiff's rights and has deprived him of his liberty interests in clearing his good name, reputation, honor or integrity and his ability to obtain future and other employment opportunities under the Fourteenth Amendment of the United States Constitution.

78.     Due to the actions of Defendants detailed herein, Plaintiff suffered lost wages and benefits, suffered emotional and mental distress and upset, including, but not limited to, pain, humiliation, embarrassment, and mental suffering, and great injury to his good name and reputation in the community and denial of future and other employment opportunities.

## COUNT II:

### DEFAMATION *PER SE*
### AGAINST ARTHUR

79.     Plaintiff incorporates by reference and re-alleges each allegation set forth above.

80.     By letter dated April 22, 2020, Arthur terminated Plaintiff's employment, stating, in part:

> While still in your 18-month probationary period, you failed to follow several policies and procedures that were taught to you during your field training. You failed to conduct surveillance rounds and falsified official Office records on numerous occasions. As such, you did not meet the standards required during your probationary period.

Ex. A.

81.     The statements set forth above are defamatory *per se* and made with knowledge that they were false or with reckless disregard of whether it was false or not, were reckless, intentional and willful.

82.     The statements about Plaintiff above impute to Plaintiff the commission of some criminal offense involving moral turpitude.

83.     The statements about Plaintiff above impute to Plaintiff unfitness to perform the duties of employment or want of integrity in the discharge of the duties of employment.

84.     The statements about Plaintiff above prejudice Plaintiff in his profession or trade.

85.     The statements about the Plaintiff above further tend to injure and have the requisite defamatory sting to Plaintiff's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him, or which tends to hold him up to scorn, ridicule, or contempt, or which is calculated to render him infamous, odious or ridiculous.

86.     Due to the false and defamatory statements about Plaintiff set forth above, Plaintiff was wrongfully fired, suffered mental and emotional distress, anxiety, shame, humiliation, embarrassment, loss of enjoyment of life, helplessness, hopelessness, and great injury to his good name and reputation in the community.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.     Enter judgment in Plaintiff's favor and against Defendants, Arlington County Sheriff's Office and/or Beth Arthur, in whole or in part;

B.     Declare the acts, practices, and/or policies complained of herein are in violation of Plaintiff's rights secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution, in whole or in part;

C.     Award Plaintiff special damages for all pecuniary losses, including, but not limited to, lost wages and/or benefits, with interest on same running from April 22, 2020 until the date a final judgment is entered;

D.     Award Plaintiff *per se* and general and special damages for all other compensatory damages, including, but not limited to, emotional and mental distress and great injury to his good name and reputation, previously, currently, and ongoing incurred attorney fees and costs not otherwise covered by 42 U.S.C. § 1988 (b) with interest on same running from April 22, 2020 until the date a final judgment is entered for him;

E.     Enjoin Defendants to provide Plaintiff a constitutionally sufficient name-clearing hearing;

F.     Award Plaintiff punitive damages in an amount not less than $350,000.00;

G.     Award Plaintiff any and all reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), under COUNT I;

H.     Award Plaintiff any and all expert fees pursuant to 42 U.S.C. § 1988(c), under COUNT I;

I.     Order Plaintiff reinstated or constructively reinstated in the form of front pay in lieu of reinstatement to his former position, with the same seniority status that he would have had but for the unlawful actions of Defendants;

J.     Award Plaintiff a separate amount to offset the adverse tax effects of lump sum payments of damages and/or back or front pay;

K.     Award Plaintiff pre and post judgment interest on both Counts I and II, and

L.     Award Plaintiff all other such equitable relief as may be appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

**GREGORY DALZELL, JR.**
*Plaintiff*

By:        _____/s/_____
James B. Thorsen, Esq.
VSB No. 18113
Jesse A. Roche, Esq.
VSB No. 82579
Attorneys for Plaintiff
THORSENALLEN LLP
5413 Patterson Avenue, Suite 201
P.O. Box 17094
Richmond, Virginia 23226
Telephone: (804) 447-7234
Facsimile: (804) 447-7813
E-mail: jthorsen@thorsenallen.com
E-mail: jroche@thorsenallen.com